[No. B239472. Second Dist., Div. Three. Sept. 6, 2012.]

PIER'ANGELA SPACCIA, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THE PEOPLE, Real Party in Interest.

## Counsel

Harland W. Braun; and Steven Graff Levine for Petitioner.

No appearance for Respondent.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Robert M. Snider and Steven D. Matthews, Deputy Attorneys General; Steve Cooley, District Attorney, Irene Wakabayashi, Roberta Schwartz and Gilbert S. Wright, Deputy District Attorneys, for Real Party in Interest.

## OPINION

**CROSKEY, J.**—Petitioner Pier'Angela Spaccia challenges by petition for writ of mandate the trial court's order denying her motion to recuse the Los Angeles County District Attorney's Office from representing the People of the State of California in a criminal prosecution arising from her alleged misconduct as assistant chief administrative officer of the City of Bell (City).[1] The charges against Spaccia relate, in part, to her involvement in the transaction by which Randy Adams was purportedly hired by the City to act as the City's chief of police, for a very substantial salary, the amount of which was hidden from the City Council. Spaccia argues that the Los Angeles County District Attorney's Office must be recused from her prosecution due to the alleged relationship between Adams and District Attorney Steve Cooley, and District Attorney Cooley's purported advice to Adams regarding his contract with the City. We conclude that the trial court did not abuse its discretion in denying recusal, as Spaccia failed to establish a conflict of interest mandating recusal of the entire district attorney's office. We further conclude that the trial court did not abuse its discretion in denying Spaccia an evidentiary hearing on her recusal motion, as Spaccia failed to submit prima facie evidence of a disabling conflict. We therefore will deny the writ petition.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

1. *The Indictment*

Robert Rizzo was the City Manager (also referred to as the Chief Administrative Officer) of the City; Spaccia was the assistant city manager.

---

[1] Penal Code section 1424 provides that, in response to a motion to disqualify a district attorney, "[t]he district attorney or the Attorney General, or both" may file "a written opinion" on the disqualification issue, and appear at the hearing on the motion. In this case, both the district attorney and the Attorney General have filed oppositions to Spaccia's writ petition, identifying themselves as attorneys for real party in interest, the People. To distinguish between the briefs of the two entities, we refer to the district attorney and the Attorney General themselves, with the understanding that their briefs were each filed on behalf of the People.

[2] A writ petition must be accompanied by an adequate record, including copies of (1) the ruling from which the petitioner seeks relief; (2) all documents and exhibits submitted to the

Rizzo and Spaccia have been charged in two separate cases alleging misappropriation of public funds and conflicts of interest. We are concerned with the second such case, in which Rizzo and Spaccia were charged, on March 29, 2011, by grand jury indictment with seven offenses.[3] Several of the counts relate to the City's contract with Adams.[4] The indictment specifically alleges that Spaccia drafted the employment contract for Adams, and sent Adams an e-mail indicating, "We have crafted our Agreements carefully so we do not draw attention to our pay." The indictment further alleges that Spaccia and Rizzo secreted Adams's employment contract, and that they also secreted an agreement indicating that Adams qualified for, and would be filing for, a medical disability pension upon his retirement from the City. The indictment alleges that Rizzo and Spaccia misappropriated public funds in the amount of the salary the City paid Adams pursuant to his contract, on the basis that the contract was unlawfully executed in violation of the City Charter.[5] It further alleges that Rizzo and Spaccia falsified Adams's purported

---

trial court supporting and opposing the petitioner's position; and (3) any other documents submitted to the trial court that are necessary for a complete understanding of the case and the ruling under review. (Cal. Rules of Court, rule 8.486(b).) As we will discuss below, Spaccia failed to include several of the required documents, and instead included numerous documents which were not submitted to the trial court, and are therefore not properly before this court. The great bulk of the factual recitations in Spaccia's writ petition are supported by citations to evidence which is simply not before this court, including, for example, references to (1) an unauthenticated YouTube video; (2) hearsay statements in newspaper articles which were never before the trial court; and (3) an unsigned, unauthenticated two-page statement purportedly attributed to Adams. As we do not consider any of the evidence which is not properly before this court, our discussion of the facts and circumstances providing the context for the recusal motion is necessarily limited.

[3] The eighth count of the indictment is against codefendant Rizzo alone.

[4] The indictment does not exclusively arise out of the Adams contract. The first count of the indictment is for conspiracy to misappropriate public funds (Pen. Code, §§ 182, subd. (a)(1), 424). Several of the alleged overt acts relate to the employment contracts, benefits, and retirement plans for Rizzo and Spaccia themselves. Indeed, count two of the indictment charges a conflict of interest arising out of Rizzo and Spaccia's involvement in the creation of their own retirement plan.

[5] The indictment references Bell City Charter sections 519 and 604(a), which set forth the contracting authority of the City Council and Chief Administrative Officer. This count appears to allege that the contract by which Adams was purportedly hired as the City's police chief was not properly authorized by the City Council. We note that Spaccia included, as an exhibit to her petition, an e-mail exchange she had with Adams during the contract negotiations, in which Adams, on the advice of counsel, asked Spaccia for a copy of the document by which the City Council had authorized Rizzo to enter into the contract on the City's behalf. Spaccia responded, in part, "We have painstakingly and carefully, and with attorney assistance made sure of what authority [Rizzo] has vs. what the City Council has. So, for your attorney's information [Rizzo] has the proper authority to enter into a Contract with you, and we are not interested in educating him on how we did that." While Spaccia's authentication of this e-mail exchange (identifying it only as "part of Grand Jury Exhibit 29") is questionable, the district attorney relied on the e-mail in its return to the petition; we therefore assume the district attorney concedes that the e-mail is properly before this court.

contracts.[6] We note that the indictment does *not* allege that any of the terms of Adams's contracts were per se illegal;[7] the indictment instead alleges that the contracts were illegally executed (on behalf of the City), falsified, and secreted.

## 2. *Spaccia's Motion to Recuse the District Attorney's Office*

On January 3, 2012, Spaccia[8] moved to recuse the Los Angeles County District Attorney's Office,[9] arguing that the purported involvement of persons within the district attorney's office in the transaction which resulted in Adams being hired by the City created an impermissible conflict of interest. Spaccia further argued that this involvement would result, and had in fact resulted, in her receiving unfair treatment at the hands of the district attorney's office.

In order to demonstrate the existence of a conflict, Spaccia relied on two pieces of evidence: (1) a declaration from Spaccia herself and (2) an excerpt from a complaint Adams had filed in a civil action against the City. Spaccia's declaration explained that she had been "an intermediary" in the negotiations between Rizzo and Adams which resulted in Adams being hired as the City's chief of police. She stated, "During these negotiations, Randy Adams told me that he had spoken with Steve Cooley, the District Attorney of Los Angeles, and discussed his plan of becoming the Chief of Police of the City of Bell. Randy Adams told me that he wanted to check out the City of Bell to make sure there were no issues and that he discussed with Cooley the salary he would receive. Cooley responded that he knew of no problems at Bell and that if they wanted to pay you that much money you should take it."[10] To

---

[6] Adams was apparently hired pursuant to two separate contracts, one for the position of chief of police and one for the position of special police counsel, allegedly for the purpose of hiding his full salary.

[7] The indictment refers to a letter of agreement indicating that Adams qualified for a medical disability pension, and would file for such disability pension when he retired from the City. Spaccia's petition suggests that the Los Angeles County District Attorney's Office is investigating Adams in connection with this pension agreement. Spaccia relies on inadmissible hearsay in a newspaper article to support this statement, and we therefore do not consider it. We note only that, to the extent the instant indictment refers to the disability pension agreement, it charges only that Spaccia and Rizzo *secreted* the agreement; it does not allege any impropriety in the agreement itself.

[8] Rizzo did not join Spaccia's motion.

[9] Spaccia did not include a copy of the motion in her exhibits in support of her writ petition, in violation of California Rules of Court, rule 8.486(b)(1)(B). The district attorney submitted it to this court as an exhibit to its preliminary response to the writ petition.

[10] That Adams told Spaccia that District Attorney Cooley had told him to accept the contract is clearly hearsay. However, it does not appear that a hearsay objection was made to this declaration before the trial court. Interestingly, at the hearing on the recusal motion, the trial court volunteered that this statement may constitute inadmissible hearsay if Spaccia subsequently sought to rely on it *at trial*. Spaccia's counsel responded that the statement would not

confirm the truth of her declaration, Spaccia relied on an excerpt from a complaint Adams purportedly filed against the City.[11] In that complaint, Adams alleged that, during the course of his negotiations with Rizzo and Spaccia, he "contacted the Los Angeles County District Attorney['s] office to inquire as to the propriety of the City's offer. Personnel from the Los Angeles County District Attorney['s] office encouraged Adams to accept the City's offer of employment." Based on her declaration and this excerpt, Spaccia argued that the Los Angeles County District Attorney's Office "was involved in the very transaction which forms the basis" of several counts of the indictment against her. Thus, she argued, a conflict of interest has been established.[12]

Spaccia also argued that she could not receive fair treatment in this case due to the conflict and that, in fact, she has already been treated unfairly. Specifically, Spaccia argued that Adams is a critical witness who could provide testimony that would exonerate her. Spaccia took the position that the district attorney's office has "skew[ed] the entire investigation away from" Adams and failed "even to interview Randy Adams,"[13] which has allegedly "made her defense more difficult." Spaccia's motion argued, "If . . . Adams had been called to the Grand Jury and testified, [Spaccia] may not have been indicted. Had . . . Adams been interviewed, that exculpatory interview would have to have been made available to the Grand Jury. If . . . Adams had been indicted, it is likely he would testify at trial and exonerate . . . Spaccia."[14]

---

be hearsay, as it would be offered only as a reason Spaccia believed the transaction was lawful. We express no opinion on the validity of that argument. However, if a hearsay objection had been raised against the statement *at the hearing on the recusal motion*, we would conclude that the statement is inadmissible hearsay. For the purpose of her recusal motion, Spaccia was not relying on Adams's purported statement to establish her own belief in the validity of the transaction, but to establish the purported fact that District Attorney Cooley actually told Adams to accept the contract. As no objection was interposed, we consider the declaration.

[11] Spaccia refers to this excerpt as "a statement Adams made in his civil complaint against" the City, filed October 3, 2011, and quotes from the document in paragraph 18 of her petition. In his return to the petition, the district attorney "does not deny . . . that Mr. Adams's declaration, submitted in his unrelated civil lawsuit, contains the comments made in paragraph 18." The district attorney is clearly in error; the document is not a declaration, but an excerpt from a complaint. There is no suggestion in the record that the complaint was verified by Adams. As such, it would appear to be inadmissible hearsay. (Evid. Code, § 1200.) However, as no objection was interposed, we consider the evidence.

[12] Interestingly, although Spaccia's declaration indicated that Adams had told her that he had spoken with District Attorney Cooley himself, Spaccia's motion argued only that *personnel from the office* had spoken with Adams (as alleged in Adams's civil complaint). In other words, Spaccia's motion sought recusal of the entire district attorney's office based on Adams's alleged conversation with unnamed personnel in the office.

[13] Spaccia did not support her motion with any evidence that the district attorney's office had failed to interview Adams, although she proffers such evidence in support of her writ petition. The district attorney does not dispute that its office has not interviewed Adams.

[14] None of this speculation was supported by any evidence.

Spaccia's motion was not supported by any declaration from Adams himself as to the identity of the person to whom he spoke at the district attorney's office during contract negotiations. Spaccia instead sought an evidentiary hearing in support of her motion, and subpoenaed Adams to appear at the hearing. It was believed that Adams might invoke his Fifth Amendment privilege not to testify,[15] and Spaccia suggested that, if he did, the prosecution should grant him limited immunity for the recusal hearing.

### 3. The Hearing and Ruling on the Motion

After the Attorney General filed an opposition to the motion,[16] a hearing was held. At the hearing, the argument quickly became focused on the issue of whether Spaccia had introduced sufficient evidence to justify an *evidentiary* hearing. Specifically, Spaccia argued that her declaration and the excerpts from Adams's complaint constituted prima facie evidence that participation of the district attorney's office in the underlying transaction required recusal. Therefore, she urged, further inquiry of Adams was justified. Specifically, Spaccia asserted that it was necessary to inquire of Adams as to the identity of the individual with whom he had spoken in the district attorney's office. Spaccia conceded that Adams's complaint indicated that he had spoken only with "personnel" at the district attorney's office, but noted that her own declaration indicated that Adams told her that he had spoken with District Attorney Cooley himself.[17] Spaccia took the position that the only way of finding out the identity of the individual to whom Adams had spoken was to elicit the testimony from Adams.[18] Spaccia conceded that, even if Adams had spoken with District Attorney Cooley, the conversation might have been a "casual" conversation "of no import." Thus, Spaccia

---

[15] Apparently, prior to the filing of her recusal motion, Spaccia filed "sort of an intent to file a motion to recuse." The record indicates that counsel for Adams had represented that if Adams were called as a witness, he would invoke his Fifth Amendment privilege. However, it was unknown if that continued to be Adams's position. Certainly, there was no declaration of Adams's counsel presented in connection with the motion to recuse indicating Adams's intent to invoke the privilege.

[16] As Spaccia's motion to recuse had not argued that District Attorney Cooley himself had been consulted by Adams during the course of his contract negotiations with Rizzo and Spaccia, the Attorney General argued that recusal of the entire office was unnecessary, as any district attorney personnel that had been consulted by Adams could simply be "walled off" from any contact with this case.

[17] Spaccia's counsel also volunteered that he had spoken with District Attorney Cooley, who *denied* the alleged conversation with Adams.

[18] The motion to recuse was not accompanied by any declaration of Spaccia's counsel indicating that he had contacted counsel for Adams and inquired as to the identity of the person at the district attorney's office with whom Adams had allegedly spoken.

sought to question Adams not only on the identity of the person with whom he spoke, but as to the content of the conversation as well.[19]

The trial court concluded that even if Adams had spoken to District Attorney Cooley himself, and District Attorney Cooley had encouraged Adams to take the chief of police position, this would not establish a conflict that would justify recusal of the entire district attorney's office. As such, the trial court denied an evidentiary hearing, and denied the recusal motion "at this time."

### 4. *The Petition for Writ of Mandate*

Spaccia then filed a timely petition for writ of mandate. The petition for writ of mandate was accompanied by a substantial number of exhibits, few of which were before the trial court at the time of the hearing on the motion.[20] Many of the exhibits consist of newspaper or Internet "blog" posts which contain multiple levels of hearsay. The petition also relied on a video of a televised press conference, purportedly available on the Internet.[21] While nearly all of these articles (and the video) were in existence at the time of Spaccia's recusal motion,[22] none of them were submitted to the trial court in connection with the motion. Spaccia nonetheless relied on this evidence in her writ petition to this court to support her argument that the entire district attorney's office must be recused or, in the alternative, that an evidentiary hearing must be held at which all of her new evidence could be considered.[23] Additionally, Spaccia argued that the trial court did not apply the proper legal test when considering a motion to recuse an entire district attorney's office.

[19] At no point did Spaccia indicate that she sought to elicit testimony from Adams, or any other witness, to support her assertion that the purported conflict created a likelihood that she would receive unfair treatment.

[20] The only exhibits before the trial court at the time of the recusal motion were the two exhibits attached to the recusal motion itself—Spaccia's declaration and the excerpt from Adams's complaint. Other exhibits, such as the e-mail exchange between Spaccia and Adams, were not actually part of the record in connection with the recusal motion, but were understood to have been known to the trial court.

[21] We do not consider the video, as it was not before the trial court. We note, however, that counsel did not submit a copy of the video as an exhibit to the writ petition, and the video is not accessible at the URL identified in Spaccia's petition.

[22] Spaccia attached an additional newspaper editorial to her reply to the preliminary opposition briefing. At the time of the hearing, this editorial had not yet been written.

[23] In response to a suggestion that the prayer for relief in her writ petition was unclear, Spaccia argued, in her reply, that she "has made two separate, alternative requests for relief: that this Court (1) order the trial court to hold a hearing and apply the new information it receives . . . ; or (2) grant Petitioner's recusal motion as to the Randy Adams counts based on the fully realized fact that the Los Angeles County District Attorney has a publicly confessed conflict of interest that undermines his moral authority and the integrity of the prosecution, and that . . . he cannot effectively be ethically screened in his Office's biggest political corruption case."

We issued an order to show cause. In the course of the briefing, we informed Spaccia's counsel that we would not consider any exhibits which were not before the trial court in the absence of a properly supported request for judicial notice. Two requests were filed; both were denied as not properly supported.

## CONTENTIONS OF THE PARTIES

Spaccia first contends that the trial court misapplied the law governing recusal of an entire district attorney's office, arguing that the case of *City and County of San Francisco v. Cobra Solutions, Inc.* (2006) 38 Cal.4th 839 [43 Cal.Rptr.3d 771, 135 P.3d 20] (*Cobra Solutions*) sets forth the proper standard. Second, Spaccia contends that the new evidence on which she relies establishes a conflict mandating recusal of the district attorney's office under the *Cobra Solutions* case. Third, Spaccia contends that she has submitted sufficient evidence to this court, and the trial court, which would mandate an evidentiary hearing on her recusal motion. In response, the district attorney and the Attorney General first argue that *Cobra Solutions* applies in civil cases, not criminal prosecutions. Second, they argue that there is no basis for this court to consider the new evidence which was not before the trial court. Third, they argue that the trial court was well within its discretion to deny an evidentiary hearing on Spaccia's recusal motion. We agree with the district attorney and Attorney General in all respects, and will therefore deny the writ petition.

## DISCUSSION

### 1. Cobra Solutions *Is Inapplicable to a Criminal Case*

We first address Spaccia's argument that *Cobra Solutions* sets forth the appropriate standard to be used in considering a motion to recuse an entire district attorney's office in a criminal case. In order to properly address the argument, a brief review of the law of recusal is necessary.

In *People v. Superior Court (Greer)* (1977) 19 Cal.3d 255 [137 Cal.Rptr. 476, 561 P.2d 1164], the California Supreme Court considered whether, and in what circumstances, a trial court possesses the authority to recuse a district attorney's office from a case and to direct the Attorney General to take over the prosecution. The Supreme Court concluded that such authority exists as part of the trial court's inherent power to control the conduct of its ministerial officers and all other persons connected with a judicial proceeding before it. (*Id.* at p. 261 & fn. 4.) As to the circumstances in which a court may order recusal, the Supreme Court held, "a trial judge may exercise his power to disqualify a district attorney from participating in the prosecution of a criminal charge when the judge determines that the attorney suffers from a

conflict of interest which might prejudice him against the accused and thereby affect, or appear to affect, his ability to impartially perform the discretionary functions of his office." (*Id.* at p. 269.)

The "appear to affect" language from *Greer* was expounded in *Younger v. Superior Court* (1978) 77 Cal.App.3d 892 [144 Cal.Rptr. 34] (*Younger*), a case which involved the situation of a former defense attorney who had become the assistant district attorney of Los Angeles County. While it was clear that the assistant district attorney could have no part in the prosecution of his former clients (or clients of his former firm), the issue raised was whether the entire district attorney's office must also be recused from those cases due to his position of authority in the office. The Court of Appeal upheld the trial court's recusal order on the basis that, even though the assistant district attorney was "walled off" from the prosecution of the cases of his former clients and those of his former firm, his presence in a position of high authority could possibly affect their prosecution. Moreover, there would be an appearance of impropriety in the public's eye. (*Id.* at pp. 896–897.) Citing *Greer*, the court stated, "Not only must evil itself be avoided but any significant appearance thereof must likewise be avoided. The presence of a former leading criminal defense attorney, near the top of a public prosecutor's office, suggests to those of a paranoid and conspiratorial turn of mind the presence of a fox in the hen house. We do not think that such abnormal suspicion has any reasonable basis in fact whatsoever, but since a public prosecutor must 'perform his functions with the highest degree of integrity and impartiality, and with the appearance thereof' [citation], for appearance's sake, the basis for this suspicion must be eliminated." (*Younger, supra,* 77 Cal.App.3d at p. 897.)

Two years later, the Legislature adopted Penal Code section 1424, which set forth a new standard for recusing a district attorney. The statute "was enacted in 1980 'in response to the substantial increase in the number of unnecessary prosecutorial recusals under the "appearance of conflict" standard set forth in [*Greer*].' [Citation.]" (*People v. Petrisca* (2006) 138 Cal.App.4th 189, 194 [41 Cal.Rptr.3d 182].) Penal Code section 1424 provides, in pertinent part, that a motion to disqualify a district attorney[24] "may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." (Pen. Code, § 1424, subd. (a)(1).)

The language of Penal Code section 1424 prohibiting recusal unless a conflict exists that would "render it unlikely that the defendant would receive

---

[24] The language of Penal Code section 1424 provides that it applies to a motion "to disqualify a district attorney from performing an authorized duty." As we will discuss, this language has been applied equally to motions to disqualify an individual deputy district attorney and motions to disqualify an entire district attorney's office.

a fair trial," was intended to abrogate *Greer*'s standard allowing recusal for an appearance of impartiality. (*People v. Vasquez* (2006) 39 Cal.4th 47, 59 [45 Cal.Rptr.3d 372, 137 P.3d 199].) Under the statute, a district attorney cannot be recused unless there is a conflict that creates "an *actual likelihood* of leading to unfair treatment." (*Ibid.*)

Our Supreme Court and Courts of Appeal recognized this change in the law and have routinely acknowledged that, after the enactment of Penal Code section 1424, neither a district attorney nor an entire district attorney's office could be recused for a mere appearance of impartiality, but could only be recused when there existed an actual likelihood of unfair treatment. (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 416 [128 Cal.Rptr.3d 611, 257 P.3d 41]; *Hollywood v. Superior Court* (2008) 43 Cal.4th 721, 735 [76 Cal.Rptr.3d 264, 182 P.3d 590]; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 719 [76 Cal.Rptr.3d 250, 182 P.3d 579]; *Hambarian v. Superior Court* (2002) 27 Cal.4th 826, 834 [118 Cal.Rptr.2d 725, 44 P.3d 102]; *People v. Eubanks* (1996) 14 Cal.4th 580, 592 [59 Cal.Rptr.2d 200, 927 P.2d 310]; *People v. Jenan* (2006) 140 Cal.App.4th 782, 791 [44 Cal.Rptr.3d 771]; *People v. Petrisca, supra*, 138 Cal.App.4th at p. 194; *People v. Neely* (1999) 70 Cal.App.4th 767, 776 [82 Cal.Rptr.2d 886]; *People v. Merritt* (1993) 19 Cal.App.4th 1573, 1581 [24 Cal.Rptr.2d 177]; *People v. Lepe* (1985) 164 Cal.App.3d 685, 687 [211 Cal.Rptr. 432].) As our Supreme Court recently reaffirmed, "the Legislature superseded the *Greer* standard by enacting [Penal Code] section 1424 . . . ." (*Stark v. Superior Court, supra*, 52 Cal.4th at pp. 416–417.)

During the course of this unbroken line of authority, the California Supreme Court considered the issue of the recusal of a city attorney in a *civil* case.[25] In *Cobra Solutions*, an attorney who had formerly represented a client in government contract negotiations with a city was ultimately elected city attorney. When the city then brought a civil action against the city attorney's former client, for fraud and breach of contract, the former client sought to recuse the entire city attorney's office. The Supreme Court noted that, as the case before it was a civil matter, the restrictions imposed by Penal Code section 1424 did not apply. (*Cobra Solutions, supra*, 38 Cal.4th at p. 850.) Instead, the Supreme Court recognized that the source of a trial court's power to recuse a city attorney in a civil case is the trial court's inherent power to control the conduct of its ministerial officers and all others connected with a judicial proceeding before it.[26] (38 Cal.4th at p. 846.)

---

[25] Penal Code section 1424 specifically applies to a motion "to disqualify a city attorney from performing an authorized duty involving a criminal matter." (Pen. Code, § 1424, subd. (b)(1).)

[26] This is, indeed, the source of a trial court's power to disqualify any attorney in a civil matter. (*Kirk v. First American Title Ins. Co.* (2010) 183 Cal.App.4th 776, 791 [108 Cal.Rptr.3d 620].)

At issue in *Cobra Solutions* was whether the judicially created rule of vicarious disqualification of an entire law firm in a civil matter should apply to a government law office when the head of that office has a conflict due to a former representation of a client the office is presently pursuing. (*Cobra Solutions, supra*, 38 Cal.4th at p. 848.) In considering whether to apply the rule of vicarious disqualification to a government law office in a civil matter, the Supreme Court considered the policy issues which, in *Greer* and *Younger*, had supported a rule allowing disqualification of a prosecutor for an appearance of impropriety only. The Supreme Court concluded that those policy concerns remained valid, and would justify vicarious disqualification of the entire city attorney's office in the case before it. (*Cobra Solutions, supra*, 38 Cal.4th at pp. 850–851, 854.) However, the Supreme Court was careful to acknowledge that the standard of *Greer* and *Younger* no longer applied in criminal cases, due to the enactment of Penal Code section 1424. The court stated, "The disqualification standard that the Court of Appeal applied in *Younger* no longer controls *criminal* prosecutions because the Legislature in 1980 enacted Penal Code section 1424 [citation], which provides for the recusal of local prosecuting agencies only when 'the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial.' [Citation.] Section 1424 is inapplicable to this case, which is a civil action. Although the statute, which triggers disqualification of a prosecutor from a criminal proceeding 'only if' the conflict is ' "so grave as to render it unlikely that [the] defendant will receive fair treatment" ' [citation], has superseded *Younger*'s holding [citation], the concerns that the Court of Appeal in *Younger* expressed about conflicted heads of public law offices, whose policymaking and supervisory duties are such as to preclude them from being effectively screened, have not lost their relevance." (*Cobra Solutions, supra*, 38 Cal.4th at p. 850.)

Spaccia would interpret the Supreme Court's language that the policy concerns in *Younger* "have not lost their relevance," (*Cobra Solutions, supra*, 38 Cal.4th at p. 850) as reviving the *Younger* standard in criminal cases seeking disqualification of an entire prosecutor's office due to a conflict of the head of the office. But as the Supreme Court itself recognized in that very same paragraph of *Cobra Solutions*, Penal Code section 1424 abrogated the *Younger* standard in criminal cases. (*Cobra Solutions, supra*, 38 Cal.4th at p. 850.) Indeed, shortly after *Cobra Solutions*, the Supreme Court stated, "An appearance of impropriety arising from participation of a conflicted prosecutor . . . is less of a consideration under [Penal Code] section 1424 than under the high court's supervisory authority. As we have previously noted, [Penal Code] section 1424 was enacted in part to tighten the standards for recusal so that a mere appearance of impropriety would not itself suffice; the statutory standard focuses instead on the actual likelihood of unfair treatment." (*People v. Vasquez, supra*, 39 Cal.4th at p. 69.) Thereafter, the Supreme Court

has continued applying the Penal Code section 1424 standard, and not the *Younger* standard, in criminal matters where the disqualification of the prosecutor has been sought. "Only an *actual likelihood of unfair treatment*, not a subjective perception of impropriety, can warrant a court's taking the significant step of recusing an individual prosecutor or prosecutor's office." (*Haraguchi v. Superior Court, supra*, 43 Cal.4th at p. 719, original italics.) There is simply no basis, in Penal Code section 1424 or case law, to infer that the *Younger* standard has any application in a criminal matter.[27]

### 2. *Recusal Is Not Mandated in the Instant Case*

■ Before considering Spaccia's argument that the new evidence submitted in support of her writ petition mandates recusal, we first consider whether the trial court erred in ruling on Spaccia's motion on the evidence before it. Penal Code section 1424 has been interpreted as providing a two-part test for disqualification. First, the court must determine whether there is a conflict of interest. Second, the court must determine whether the conflict is so severe as to disqualify the district attorney from acting. (*People v. Eubanks, supra*, 14 Cal.4th at p. 594.)

The first part of the test is satisfied by either an apparent or an actual conflict. A conflict exists, for the purposes of Penal Code section 1424, " 'whenever the circumstances of a case evidence a reasonable possibility that the [district attorney]'s office may not exercise its discretionary function in an evenhanded manner.' " (*People v. Eubanks, supra*, 14 Cal.4th at p. 592.)

As discussed above, however, the second part of the test requires that the conflict be so grave as to render it unlikely that the defendant will receive fair treatment. (*People v. Eubanks, supra*, 14 Cal.4th at p. 594.) Disqualification under Penal Code section 1424 is not permissible "merely because the district attorney's further participation in the prosecution would be unseemly, would *appear* improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system. [Citations.]" (14 Cal.4th at p. 592.) Thus, whether the prosecutor's conflict is actual or apparent, it is only disqualifying when the potential for prejudice to the defendant is itself real. Indeed, the potential for prejudice must rise to the level of a likelihood of unfairness. (*Ibid.*)

■ Moreover, "[r]ecusal of an entire district attorney's office is an extreme step. The threshold necessary for recusing an entire office is higher

---

[27] *In re Charlisse C.* (2008) 45 Cal.4th 145 [84 Cal.Rptr.3d 597, 194 P.3d 330], on which Spaccia also relies, is a dependency action, not a criminal prosecution. Thus, it has no bearing on the standard to apply in a criminal prosecution, where recusal motions are governed by Penal Code section 1424.

than that for an individual prosecutor." (*People v. Cannedy* (2009) 176 Cal.App.4th 1474, 1481 [98 Cal.Rptr.3d 596].) An entire prosecutor's office should not be recused unless it is necessary to assure a fair trial. The showing of a conflict necessary to justify so drastic a remedy must be especially persuasive. (*Id.* at p. 1482.)

We "review the superior court's factual findings for substantial evidence and, based on those findings, determine whether the trial court abused its discretion in denying the recusal motion." (*Hambarian v. Superior Court, supra,* 27 Cal.4th at p. 834.) "We review rulings on motions to recuse only for abuse of discretion precisely because trial courts are in a better position than appellate courts to assess witness credibility, make findings of fact, and evaluate the consequences of a potential conflict in light of the entirety of a case, a case they inevitably will be more familiar with than the appellate courts that may subsequently encounter the case in the context of a few briefs, a few minutes of oral argument, and a cold and often limited record. [Citations.]" (*Haraguchi v. Superior Court, supra,* 43 Cal.4th at p. 713.)

■ With the standard of review thus established, we consider whether the trial court abused its discretion in denying Spaccia's motion to recuse. Even assuming that Spaccia had established an actual or apparent conflict, based on Adams's purported discussions with District Attorney Cooley prior to signing the contract, the trial court concluded that Spaccia had failed to establish that the conflict created a likelihood of unfairness in her trial. The trial court's conclusion is supported by the evidence, as Spaccia's arguments for a likelihood of unfairness were nothing more than speculation. First, Spaccia speculated that Adams's testimony, or his statements to the district attorney if interviewed, would exonerate her. Second, Spaccia speculated that Adams would exercise his Fifth Amendment privilege not to testify at trial if she subpoenaed him to testify in her defense, but would choose instead to take the stand (and give such exonerating testimony) if charged as a codefendant. Third, Spaccia speculated that the district attorney would not offer Adams immunity, which would prevent him from exonerating her if he is not charged. Yet, Spaccia offered no evidence to support any of these theories.[28] "[A] motion to disqualify a prosecutor must be based upon a likelihood of

---

[28] Spaccia's theories are unsupported both procedurally and factually. As to procedure, there is no basis for her assumption that Adams would exercise his privilege not to testify if called as a witness on her behalf, but would choose to testify if charged as a codefendant. Factually, there is no evidence supporting Spaccia's assertion that Adams would exonerate her. We again note that Spaccia is not charged with any crime relating to the *content* of the Adams contracts; she is charged with illegally executing the contracts on behalf of the City, falsifying them, and secreting them. It is unclear how Adams would possess exonerating information regarding Spaccia's handling of the contracts relative to the City. This is particularly so given her e-mail to Adams indicating that she did not want to "educat[e]" Adams's counsel as to how Rizzo obtained authority to contract with him on behalf of the City. While Spaccia suggests that

unfairness and not upon mere speculation." (*People v. Parmar* (2001) 86 Cal.App.4th 781, 800 [104 Cal.Rptr.2d 31].) Thus, the trial court did not abuse its discretion in denying the motion to recuse.

Spaccia argues, however, that District Attorney Cooley must be recused due to additional evidence she has presented for the first time in connection with her writ petition.[29] We reject this argument for two reasons. First, we do not consider evidence which was not before the trial court when it ruled on the motion. (*People v. Superior Court (Lavi)* (1993) 4 Cal.4th 1164, 1173, fn. 5 [17 Cal.Rptr.2d 815, 847 P.2d 1031].) Second, the vast bulk of Spaccia's evidence is offered to support her argument that there would be an appearance of impropriety if the district attorney's office continues to prosecute this case; as discussed above, an appearance of impropriety is an insufficient basis on which to recuse a prosecutor's office in a criminal case.

### 3. The Trial Court Did Not Err in Denying an Evidentiary Hearing

Penal Code section 1424 provides that, after briefing on a recusal motion, the trial court "shall review the affidavits and determine whether or not an evidentiary hearing is necessary." Spaccia contends the trial court erred in denying her an evidentiary hearing in which she sought to obtain Adams's testimony regarding the identity of the person in the district attorney's office with whom he spoke and the substance of the conversation.

We sought additional briefing from the parties on the issues of (1) the standard of review of a trial court's denial of an evidentiary hearing under Penal Code section 1424 and (2) the showing which must be established in

---

Adams could testify to an innocent explanation for her seemingly incriminatory e-mails, the trial court was not required to reject the e-mail evidence in favor of Spaccia's suggestion to the contrary.

[29] Spaccia's writ petition argues: "The [trial] court unfairly limited its analysis to the one conversation [alleged between Adams and personnel at the district attorney's office] and failed to take into account that: (1) Adams has access to Cooley due to their relationship that dates back 15 years; (2) Cooley denied a conflict exists in this case; yet three days after [the] arrests in the Bell case, Cooley declared a conflict of interest in his Office's investigation of Adams's pension deal with Bell; yet Adams's pension deal is part and parcel of the prosecution's case against petitioner; and (3) even though Adams is either a suspect or key witness in this case, the District Attorney's Office decided not to interview him, or even attempt to interview him, further underscoring Cooley's conflict of interest and impairing petitioner's right to a fair trial." The trial court did not "unfairly" "fail[]" to "take into account" any of these items. No evidence of the first two items was before the trial court. As to the third, there was no evidence that the district attorney's office had failed to *attempt to interview* Adams. It was, however, argued before the trial court that the district attorney's office had not interviewed Adams, and there is no indication in the record that the trial court disregarded that fact. Spaccia simply failed to establish any connection between the district attorney's failure to interview Adams and any likelihood of unfairness to her.

order to obtain such a hearing. Other than the legislative history of the relevant language in Penal Code section 1424,[30] the parties have submitted no authority directly on point, although they seek to draw analogies to cases permitting evidentiary hearings in other contexts. Our independent research has similarly disclosed no controlling authority.

█ The first issue, the standard of review, is resolved by the language of the statute itself. Penal Code section 1424 provides that the trial court "shall . . . determine whether . . . an evidentiary hearing is necessary." (*Id.*, subd. (a)(1).) As the statute does not provide that an evidentiary hearing must be granted in any particular set of circumstances, we conclude that the statute contemplates an exercise of discretion on the part of the trial court in determining whether a hearing is necessary. We thus review the trial court's decision for an abuse of discretion. The parties concur that abuse of discretion is the appropriate standard of review.

The second issue, on what basis the court should exercise its discretion in determining the necessity of a hearing, is one of first impression. In 1999, Penal Code section 1424 was amended to provide for an evidentiary hearing. Prior to that time, Penal Code section 1424 did not specifically provide for an evidentiary hearing; it spoke only of "the hearing on the motion." In 1999, however, the Legislature enacted Statutes 1999, chapter 363, section 1, page 2606, which amended Penal Code section 1424 to provide, in pertinent part, that (1) a motion to disqualify the district attorney shall be accompanied by competent witness affidavits; (2) the district attorney and Attorney General may file affidavits in opposition; and (3) "[t]he judge shall review the affidavits and determine whether or not an evidentiary hearing is necessary." We must determine the Legislature's intent with respect to the circumstances in which a trial court should determine that an evidentiary hearing is necessary.

There is some guidance to be found in the legislative history. On January 15, 1999, Assembly Bill No. 154 (1999–2000 Reg. Sess.) was originally introduced to amend Penal Code section 1424. As originally introduced, the bill would (1) require the disqualification motion to be accompanied by affidavits; (2) permit the district attorney and the Attorney General to file affidavits in opposition; and (3) provide that "[a]n evidentiary hearing shall not be held unless there are disputed issues of material fact that cannot be resolved through the use of affidavits." (Assem. Bill No. 154 (1999–2000 Reg. Sess.) as introduced Jan. 15, 1999, p. 2, italics omitted.) While the first two provisions were ultimately enacted, the third was not.

---

[30] We take judicial notice of the legislative history. (Evid. Code, § 452, subd. (c).)

■ "[W]hen the Legislature amends a bill to add a provision, and then deletes that provision in a subsequent version of the bill, this failure to enact the provision is of little assistance in determining the intent of the Legislature." (*American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1261–1262 [23 Cal.Rptr.3d 453, 104 P.3d 813].) The reason for this rule of statutory interpretation is obvious. When it is known only that the provision was not enacted, there is no basis for inferring, for example, that the provision was not enacted because it was believed to be superfluous, or, alternatively, that it was not enacted because the Legislature believed it to be bad policy. In this case, however, the language providing that an evidentiary hearing should not be held unless there exist disputed issues of material fact that cannot be resolved on affidavits alone was not merely *deleted*; instead, it was *replaced*.

Moreover, further guidance is presented by a committee report, which explains the reason for the replacement. "The author will propose the following amendment in Committee: [¶] Delete the following language from page 2 lines 16–18 'An evidentiary hearing shall not be held unless there are disputed issues of material fact that cannot be resolved through the use of affidavits' and replace it with the following: [¶] [']The judge shall review the affidavits and determine whether or not an evidentiary hearing is necessary.['] [¶] The proponents want the judge to decide the recusal issue solely on the affidavits if that is possible. They believe this would reduce the potential of 'fishing expeditions' by defense attorneys and save on court time. [¶] [California Attorneys for Criminal Justice] believes that 'evidentiary hearings are the most reliable way for a court to determine whether there is, in fact, a conflict of interest that would require the disqualification of a District Attorney's office.' [¶] [California Attorneys for Criminal Justice] also notes that recusal motions are rare and 'there is no evidence that the current system for handling alleged District Attorney conflicts of interest is not working.' " (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 154 (1999–2000 Reg. Sess.) as amended May 18, 1999, pp. 5–7.) In other words, the initial proponents of the bill sought to have the disqualification issue resolved on affidavits whenever possible, so they argued in favor of the initial language limiting the availability of evidentiary hearings. However, opponents of that language argued that evidentiary hearings were valuable on the issue of disqualification and should be more freely available. As the language limiting hearings was ultimately *rejected in favor of* language leaving the issue of whether to hold a hearing to the trial court's discretion, we can infer that the Legislature expressly chose *not* to limit evidentiary hearings to only those

situations in which there exist disputed issues of material fact which could not be resolved on affidavits alone.[31]

■  It is clear, then, that trial courts have discretion to determine, after reviewing the affidavits, whether an evidentiary hearing on a Penal Code section 1424 motion "is necessary." It is further clear that a hearing may be deemed "necessary" by the trial court even if the movant has not established the existence of disputed issues of material fact that cannot be resolved through the use of affidavits alone. But we must determine on what showing the trial court's denial of a hearing constitutes an abuse of the broad discretion it has been granted by the Legislature.

■  We conclude that, at a minimum, in order to establish an abuse of discretion in the denial of a hearing, the moving party must show that it submitted sufficient affidavits to establish a prima facie case for disqualification. One situation in which a trial court is called upon to determine whether to grant an evidentiary hearing on an issue is a petition for a modification of a dependency order, under Welfare and Institutions Code section 388. Welfare and Institutions Code section 388 permits a parent or other interested party to seek to modify an existing dependency order. If it appears to the court that the best interests of the child may be promoted by the proposed change of order, the court shall order that a hearing be held on the issue. (Welf. & Inst. Code, § 388, subd. (d).) The courts have concluded that a "parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 310 [19 Cal.Rptr.2d 544, 851 P.2d 826].) "A 'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593 [50 Cal.Rptr.2d 745].) Similarly, an inmate seeking habeas corpus relief must state a prima facie case in order to obtain an order to show cause. (*In re Martinez* (2009) 46 Cal.4th 945, 955 [95 Cal.Rptr.3d 570, 209 P.3d 908]; *In re David* (2012) 202 Cal.App.4th 675, 681 [135 Cal.Rptr.3d 855].) In our view, a similar test should apply when a party seeks a hearing on a recusal motion under Penal Code section 1424: the party

---

[31] We cannot conclude whether the Legislature specifically approved of the argument of California Attorneys for Criminal Justice. That is to say, it is unclear from the legislative history if the Legislature *agreed* that evidentiary hearings are "the most reliable way" to determine whether a disqualifying conflict existed or if it simply chose to leave the issue of whether to grant evidentiary hearings *entirely* to the discretion of the trial courts hearing the motions. The one thing we can infer, however, is that the Legislature, when faced with California Attorneys for Criminal Justice's specific opposition to the initially proposed language limiting the availability of evidentiary hearings, *struck the challenged language from the bill and replaced it with less restrictive language.* We therefore reject the district attorney's argument that, although that language was ultimately stricken from the bill, we should assume that the Legislature nonetheless intended that the initially proposed language govern trial courts' decisions to grant evidentiary hearings on disqualification motions.

seeking an evidentiary hearing must make a prima facie showing by affidavit; a prima facie showing refers to those facts demonstrated by *admissible* evidence, which would sustain a favorable decision if the evidence submitted by the movant is credited.[32]

In this case, however, Spaccia failed to make such a showing. Spaccia proffered evidence that Adams, prior to taking the contract with the City, contacted someone at the district attorney's office, possibly District Attorney Cooley, and was "encouraged" to take the job at the salary offered. Spaccia sought an evidentiary hearing to elicit testimony from Adams as to the identity of the person with whom he spoke, and the subject matter of the conversation. Yet, as the trial court concluded, even if Spaccia's allegations were correct and District Attorney Cooley himself encouraged Adams to take the job, this would not justify the recusal of the district attorney's office. This is so because, as we have discussed above, Spaccia has failed to establish the second element necessary for recusal, a likelihood of unfair treatment, with any evidence beyond mere speculation.[33]

In short, the trial court did not abuse its discretion in denying an evidentiary hearing. Even if an evidentiary hearing established everything Spaccia had hoped it would establish—that District Attorney Cooley had encouraged Adams to take the chief of police position—it would not justify recusal of the district attorney's office, because there was no evidence of a likelihood of unfair treatment.[34]

---

[32] We note that, at the hearing on the recusal motion, Spaccia's counsel twice used the phrase "prima facie" in arguing that Spaccia's evidence entitled her to an evidentiary hearing.

[33] Perhaps aware of this deficiency in her evidentiary submission, Spaccia argues that in order to obtain an evidentiary hearing, she need only make a showing of evidence as to the first element necessary for recusal (an actual or apparent conflict), without any showing as to the second element (likelihood of unfairness). For this proposition, she relies on language in *Lewis v. Superior Court* (1997) 53 Cal.App.4th 1277 [62 Cal.Rptr.2d 331]. *Lewis* is wholly irrelevant to this case. While *Lewis* involved a recusal motion, the motion was denied "[a]fter lengthy hearings" (*id.* at p. 1281), and the court's analysis therefore did not have any bearing on the showing which must be made in order to obtain a hearing. In any event, Spaccia's argument is simply unpersuasive. The undisputed purpose behind the enactment of Penal Code section 1424 was to guarantee that a district attorney would not be disqualified unless it was established that the conflict would render it unlikely that the defendant would receive a fair trial. As such, we cannot infer that, when the Legislature amended the statute to expressly provide for an evidentiary hearing on a disqualification motion, the Legislature intended to provide for evidentiary hearings when no prima facia showing had been made that the conflict would, in fact, render it unlikely that the defendant would receive a fair trial.

[34] This court expresses no opinion on whether Spaccia can pursue a second motion to disqualify the district attorney, supported by the additional evidence which was not before the trial court.

## *DISPOSITION*

The petition for writ of mandate is denied.

Klein, P. J., and Kitching, J., concurred.

On September 25, 2012, the opinion was modified to read as printed above.